I'm Michael McConnell. I represent Marvin and Laura Horne for the appellants in this case challenging an order of the Department of Agriculture obstructing them to pay over $650,000 for failure to turn over property to the Department of Agriculture under a program that the Hornes contend is unconstitutional. I'd like to, I'm hoping to save about five minutes for rebuttal. Now, I realize that this Court is intimately familiar with the facts and the basic arguments in this case, so with your permission, I'd like to proceed immediately to what we see as the changes in the legal landscape that have occurred since this case was briefed and argued the last time. Last term in the Supreme Court, the Court decided an unprecedented four takings clause cases, deciding all of them in favor of the property owner. The most pertinent of those cases is Coontz v. St. John's River Water Management District. In that case, the Court held, and I quote, when the government commands the relinquishment of funds linked to a specific identifiable property interest, a per se takings approach is the proper mode of analysis, and that this is true even when the taking is in the form of a condition imposed on a voluntary transaction, like developing a plot of land or selling raisins in interstate commerce. That holding is directly applicable here, and I think is dispositive of the principle arguments on which the government prevailed in the earlier iteration of this case. This case involves an order directing the horns to pay the monetary equivalent of the value of the reserve raisins, that is, the number of raisins multiplied by the field price, as a condition to selling the rest of their raisins. Under Coontz, this is a per se taking, not a regulatory taking. And as the Court reiterated again last term, in Arkansas Game and Fish, where there is a per se taking, the government has a, quote, categorical duty to compensate the owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. What would be the measure of compensation? The entire fine? Yeah. Well, the entire compensatory fine and civil penalty. We are not challenging the assessments or other very minor parts of the fine. No offset for the profit they made as part of being part of the enterprise? The government, in order for there to be an offset, the government bears the burden of showing that there's a direct and specific benefit and evidence in the record that is non-speculative about the value of that offset. The government has done no such thing. The value of the raisins was set by the Department of Agriculture. The horns have not challenged that valuation. And that valuation stands. They're compelled to be part of the enterprise, aren't they? As a condition to engaging in the business, yes. All right. Go ahead. And I believe that this means that the only serious remaining question is whether the horns are the proper party to defend against this taking. That is, when the fog clears and you see, you follow the money, at the beginning the growers grow raisins, they own the raisins. At the end, if the government prevails, then the government owns either the raisins or the monetary equivalent. And the question is, who is injured by this program? If it is a per se taking, who is injured? And the answer is Marvin and Laura Horne and no one else. The growers have been fully compensated. They've been paid for their raisins. The government now is seeking to own the property. The entire economic burden of this taking falls upon the Hornes and on no one else. And this distinguishes all of the cases that the government has cited with respect to standing. In all of those cases where standing was rejected, the parties going before the court did not have a financial interest. They would not own the money. But in this case, not only are the Hornes the only ones who have been injured, but they are the only ones who will incur the benefit of upholding if it's in their favor. And it seems to us that given the Supreme Court's cases last year, we are now in a situation where it's quite clear that there was a per se taking. And it seems also clear that the Hornes are the proper party to bring this action. They're bringing it in a defensive posture to prevent the taking and that they're entitled to that relief. Scalia. Well, you've used five minutes instead of saving five. I have. Does the court not have more questions about this? Well, maybe after we hear from the government. Maybe I'll reserve 15 minutes and 8 seconds for rebuttal for the first time in my career. Thank you. Thank you. May it please the Court. My name is Joshua Waldman. I'm here from the United States Department of Justice, representing the United States Department of Agriculture in this case. He says Kuhn's controls, I suspect you think, is an ollen and dollen. Yeah. Well, first of all, yes. Yes, you're correct. Yeah, is about the last word you want to use in front of the Court of Appeals panel. I'm sorry. Yes, Your Honor. I don't agree with his view of Kuhn's. Tell us why. Well, the selective quote that he read about the government commanding relinquishment, when you actually read the sentence in the Supreme Court's opinion, it begins Petitioner claims and then the rest of the sentence. So it's not a holding of the Court. And we know this because the Court restates what its holding is at the end of the Kuhn's opinion. And what it is, I'd like to read the holding, what they say, we hold, the government's demand for property from a land-use permit applicant must satisfy the requirements of nollen and dollen, even when the government denies the permit and even when its demand is for money. So what Kuhn's is saying is just the same thing that nollen and dollen held, which is nollen and dollen is not a per se test. They're asking for a per se rule. Nollen and dollen is a sort of an ad hoc balancing. And so Kuhn's just reaffirmed that in the land-use permit area where there's a condition that something that would be a per se taking on its own, if it was just an exaction, turns into something that's not a per se condition, a nollen and dollen balancing, when it's a condition. And, Your Honor, you asked are they commanded to do the raisins. He said yes, as a condition of selling raisins on the interstate market. It is a condition of selling on the interstate market, not a command. If you grow raisins in your backyard and you eat them for personal consumption, you're not part of the reserve requirements. So it's a condition on the market. Just sort of be the wickard, the field and the raisins, right? It could be that. So how do you grow a raisin? I thought they were grapes. Well, you do grow grapes and then you dry them into raisins. Yes. They're turned into grapes and into raisins. And this panel emphasized when it correctly rejected the takings defense nearly two years ago that the fact that this is a condition on the market, on the sale of personal property, makes a very big difference on whether or not a per se rule or a Penn Central ad hoc rule ought to apply. And remember, the plaintiffs in this case have waived, intentionally abandoned any Penn Central analysis and it advanced only a per se rule. A per se rule that would require this court to ignore investment expectations, ignore the actual economic impact of the rule, ignore the public purposes of the reserve requirement. And as the Supreme Court held in Yee and in Tahoe Sierra, if you abandon a Penn Central claim, that's it. And then if you don't have a per se claim, that's the end of the case. And that's what should happen here. Now, one of the things that the plaintiffs try to argue is that the government, in the colloquial sense, takes their raisins and then uses them for their own purposes or buries them or that's just not how the program works. And I think it's vital for you to understand how the program works because it's key to understanding why a per se rule does not apply. Is it the government's position that this should be sent back to the agency or just deny the claim? What's your decision on that? Well, it's not a denying a claim. It's a defense that they raise. But I think you should not send it back to the agency. You should just say that the takings defense that they raise as a defense of paying the fine is meritless and therefore the claim stands, and then you affirm the judgment. But here's what happens. It didn't look like the Supreme Court thought it was meritless. Well, the Supreme Court didn't actually address the takings claim at all. All they addressed was whether this Court has subject matter jurisdiction to entertain the merits of the claim. And it – I don't think the Supreme Court had sort of the full knowledge of how the program works, which I'd like to explain because I think it's vital to the takings claim. When the raisins are put in the reserve, and sometimes there's no reserve. The last three years there's been no reserve. When the raisins go into the reserve, they're held to the account of the committee. That's the language of the regulation. And they are sold, not given away, not buried in a ditch, not forgotten about. They are sold. The regulation says sold. They are sold for real value. And the producers, the growers of the raisins, own, as a property interest, the net equitable revenue from the sale of those raisins. The committee tracks how much raisins each producer puts into the reserve pool, has a third-party CPA audit the books so they can track what you put in and how much of the net equity you get back. And in many years, this is tens of millions of dollars. Are all the surplus raisins sold in the open market? A great majority of them are sold. It depends year to year. Some of them are carried over because this is from one crop year to the next, because the ultimate goal here is to smooth the peaks and valleys of the crop fluctuations. So sometimes there's no reserve pool. Sometimes there's a small reserve pool that's sold. And sometimes some of it's sold, some of it's carried over. And what they do is the regulations themselves say, and just to quote the terms, I'm getting it straight, that the committee has an obligation, quote, to maximize producer returns when it's selling it. Sometimes in a particular year, just to give an example, the committee knows what the average domestic demand for raisins is. It's about 200,000 tons per year. Sometimes the crop vastly exceeds that, 400,000 tons in a particular year. And you don't have to be an economist to know what that's going to do to raisin prices if you just let everything out on the market.  Now, the committee then sells those either in that year or holds them to the next year, releases them, and they get sold. And they are sold at the highest price that they can get under market conditions. Very often, that's exactly the same as the free tonnage prices. And they have programs to release them in later years or small amounts of them, if the market looks like it's appropriate for that, in that particular year. And they're sold, and revenue is generated, and the net revenue goes to the producer. In the 2002-03 crop year, which is one of the two years that we're talking about in this case, $47 million went back to producers. That's a property interest in the property. And here's why that's important. When the Supreme Court looks at whether a per se rule or a Penn Central test applies, one of the most critical factors is whether the property interest that's alleged to be taken, whether some of that remains with the property owner or with the government, has taken all of the property interest. And the two classic cases that demonstrate this are the Pee Wee Coal case, the coal seizure case from World War II. On the one hand, which is a, in the words of the Supreme Court, the government takes full title and ownership as if it owned the coal mines in fee simple. That's a per se taking. On the other hand, you have an example like Hodel versus Irving. This is the Indian Land Use Consolidation Act where title to real property is cheated from the title owner to the tribe. There, the statute literally takes title from the property owner and gives it to the tribe. And what is left for the property owner? Almost nothing but a small sliver, which is the right to occupy the land during your lifetime, which in that case was two months because the statute was passed in January of 1983 and the property owner died two months later. And the Supreme Court said that's not much to leave to the property owner, but it is a property right that remains with the owner. And because of that, Hodel was a case that applied the Penn Central balancing test, not a per se rule. And that is all the difference in the world. Does the property owner keep something? What do they retain? Or is the whole thing taken from them? In our case, the property owner, the grower of the raisins, retains by statute and regulation net, his net equitable share that is directly tied to the value of the property, the proceeds that are generated by selling them, which in this case, in one of the years, was $47 million, $272 per ton of the raisins sold from the reserve. And we think when you combine the property interest that remains with the owner with the fact that this is a condition, a condition on entering the interstate market of raisins, that those two things take this out of a per se analysis. They might have a Penn Central claim, but of course, they've abandoned that claim. So once you get out of the world of a per se taking, this case is over. And I think it's very clear that because they retain equity, the property interest in the property, and Loretto, the case that they lean on most, directly says that. Loretto, of course, is the cable box case. And when you get to the end of the opinion, the Supreme Court says, look, it's a totally different case if instead of requiring the owner of the property to let the cable box in that he owns, that's a totally different case. That's not a per se case because the owner of the rental building owns that box and has control over it. And that property right, that stick in the bundle, is crucial to the difference between a per se taking and a Penn Central analysis. So all the cases point in that direction. And here, not only is it a condition, but it's a condition that producers have an enormous amount of control over. The marketing order itself required two-thirds of the producers to vote it in in the first place. And if a majority of them don't like it, they can vote and it terminates. The raise in reserve is governed by a committee of 47 people. Thirty-five of them are voted in by producers. On top of that, if you still don't like it, you can grow a variety of raisins, and there are eight different recognized varieties. You can grow a variety that's not subject to a reserve requirement. You can keep your grapes as grapes and sell them as table grapes or turn them into juice or just be a handler as they are, and that could be your industry. So there's a variety of things, all of which makes it a condition on the market and one over which they have a large amount of control. And I think in case after case, the Supreme Court has said when you have a condition, not a command, but a condition, something that otherwise might even look like a per se taking moves to a balancing test. That's right out of Nolan Dolan and it's right out of the Kuhn-Kaints that they rely on. And I know they want to say Loretto said it didn't matter that you could have gone out of business. That's a totally different question. The question is, when it's a voluntary condition on entering the market, the condition itself takes you from a per se world to a Penn Central analysis. Counsel, if I could ask you a question, please. Absolutely. What is it in the record that demonstrates that they have abandoned or waived any claim under the Penn Central balancing theory? Well, that's how they've litigated this case all along. And even you can even look as recently as the en banc petitions would say, we don't and this is almost a direct quote, but we don't advance a regulatory taking argument. We advance a per se claim. That's always how they argued it. Your last opinion last time around recognized the fact that they are only advancing a per se claim. And they're up here now saying that Kuhn-Kaints gives them a per se rule. I disagree with that, but they've never argued anything other than a per se rule even today. So I think that's that's why what you can see in the record. But on top of all that, I'm sorry, Your Honor, that I cut you off. I'm sorry. I said, OK. I just wanted to know the basis for that in case they on the 15 minutes of rebuttal, they've got left in case they shift their theory. I wanted to know if if there really was a waiver. My understanding is it's more than a waiver. It's an intentional litigation strategy to push only a per se rule. And I think that's pretty clear in the briefing. I would also say that I think that they sometimes there is shifting, I think, in this case. And I just wanted to point out to the court, which is sometimes my understanding of the theory is you can't fine us because the underlying regulation is unconstitutional. That's unconstitutional because the reserve would affect a taking had we complied with it. But sometimes you see the argument shift to, you know, it's the money itself that was a taking, which I don't think is really what they're advancing. And if it was just a fine in and of itself, I think Sperry Corporation would deal with that pretty summarily and just say things like user fees and fines. They're just not takings and certainly not per se takings. Counsel, let me ask you another question just to elaborate on the per se issue. It sounded from your opening argument, the start of your argument, that you thought they were advancing the Supreme Court case incorrectly, that they were relying on language from that case that was the contention of the party rather than what the holding of the court was. So what I'd like to ask is this. What do you think is their strongest case? If they have any case that supports the per se taking theory, and then what's your answer to that case? Or, I mean, if you think there's none, just go ahead and say that. Well, I mean, I'd ask them what they think their case is. But I don't think that there's any case that holds a per se rule applies to a condition on personal property when valuable property interests remain with the property owner. All the cases from Hodel to even the Nixon paper case talks about when property is all removed from the case, which is what they rely on. The eagle feather case, Andrus, when a valuable property right remains with the eagle owner, which is namely the right to possess it, you're not in a per se taking world. In that case, it happened to be possession of the eagle feather, but it doesn't have to be possession. As long as it's a valuable stick in the bundle, then you're out of the per se world. But I guess if I had to ask them, I would – I mean, when you look at Kuhn's, the argument that the Petitioner built in that case – and, I mean, I have the case right here. It says this is Petitioner's claim. But the argument being made was what's cited there by the Petitioner and then the legal funds, and that's a completely different case because there, net interest is taken from the owner, but nothing remains with the owner. The government takes all of it, all the interest. But here, a valuable property right remains with the producer of the grapes, namely, the net equity that gets them tens of millions of dollars directly tied to the value of the raisins when they're sold. And that value is returned to the producer. But I just wanted to end on one final point, if I may, which is just to get back to the question of most of these raisins, they don't even own. The vast majority of them are not theirs. And it's very clear from this Court's Washington Legal Foundation opinion on Vaughan's decision that when you don't own the property interest alleged to be taken, you can't bring a takings claim. Rights – They can't particularly bring a takings claim? If it's the – well, first of all, the Bailey would have to have a property interest. I know that they claim that California law says that they do. But whatever California recognizes as a Bailey's property interest, it's not the property interest at stake in this case, which is the right to the proceeds from the sale of raisins. That's what exactly the Supreme Court understood their argument to be, that that was a property interest that's taken. A Bailey doesn't have a property interest in the sale of proceeds from the raisins. When I left the hotel this morning, I leave my luggage with a valet. He's a Bailey. If California recognizes some property interest for him, that may be. But he certainly doesn't have a property interest in the sale of the proceeds of my luggage. Scalia's standing with respect to their own raisins. Oh, absolutely. With respect to the ones that they own, they clearly do. But, of course, they also retain a property right in that – in those raisins, namely the net equitable share. Now, they didn't get anything back because they didn't actually comply with the regulation. But had they complied with the regulation, it would have gone into the reserve pool and they would have gotten their net equitable share of the $47 million. But when you don't own the property interest, and it has to be the property interest alleged to be – not any property interest, but it has to be the property interest that you allege to be taken, a Bailey doesn't have that property interest in the proceeds from the sale of the raisins. I think their argument is that the fine is what we ought to focus on. Right. And that's where, as I said before, sometimes the argument shifts, which is, first it was, you can't fine me because if I could – the reserve requirement itself affects the taking of the raisins. And then when you say, well, you don't own those raisins, well, it's the money. But if it's the money, it's the money. But didn't the Supreme Court emphasize the fine? They did emphasize the fine, but they said the reason why the fine might – the reason – the argument for why the fine is impermissible is not that a fine in and of itself is a taking, but when the regulation that you are supposed to comply with and don't is itself a taking, then you can't be fined for refusal to comply with it. That was the theory. But you first have to show that the regulation itself affects an unconstitutional taking, which it does, not by putting fines for failing to follow it, but because, allegedly, of the reserve requirement. So you still have to ask, was the reserve requirement affecting a taking? And it isn't because of the property interests that remain with the producer. But to go to the point about can they assert the claim, the thing being – allegedly being taken by the reserve pool is the right to the proceeds of the sale of raisins, which is something that a handler who doesn't own those raisins and never had doesn't have any of that property interest. So whatever he does or doesn't have, it's not an interest in the sale of the proceeds of raisins. And that's why they switch their argument to it's the fine itself, not unrelated to the raisins that we don't own, it's the fine. But a fine for failing to follow a regulation is not and has never held to be a taking per se or otherwise. If it did, you couldn't fine anyone for anything, because it would always be a taking. They have to rely on the raisins to advance their taking defense, but that is property that they don't own the property interest alleged to have been taken. And if there are any further questions, I'd be happy to answer them. Otherwise, I would urge the Court to affirm the district court's judgment. Thank you, Jens. Well, Mr. McConnell, you have 15 minutes for rebuttal. Well, I'm glad I saved that much, because we heard a great deal from the government. I'd like to begin with the question of whether this is a per se taking and the relevance of Kuntz. My friend suggests that we mistake a summary of the party's position for the Court's holding. I'm confident that when you read the opinion, you will agree that the Court is endorsing the argument presented by the Petitioner. And in fact, the Court treats the taking in Kuntz as a per se taking and rejects the argument that the fact that it was imposed as a condition to engaging, to receiving permission to do something else made it anything else. The government is confusing two concepts. One is whether the taking is a per se taking, and the other is whether Nolan and Dolan apply. Nolan and Dolan, it's an entirely different question. Nolan and Dolan have to do specifically with the situation where the taking is imposed as a means of mitigating the adverse consequences, or the Court in Kuntz describes the negative externalities from the property owner's action. So when the government defends its taking on the ground that the taking is necessary in order to mitigate a nuisance or bad effects from the property owner's activity, then that defense, the government's defense is evaluated according to the nexus and proportionality test, but not in cases where there's no mitigation involved, as this one. Or say, Loretto, which is also a condition case where the landlord's ability to rent the apartment is conditioned on allowing the government to install this cable box. Also a per se case, no mention of Nolan and Dolan. Nolan and Dolan are really outside the point here, because the taking here, which is the assumption of ownership of these raisins, does not in any way, shape, or form mitigate any supposed harm that the horns are engaged in. We would assume that there's no harm to begin with, but in any event, the taking, for the government to take ownership of the raisins or the monetary equivalent is completely irrelevant to any possible harm. And so Nolan and Dolan are beside the point. Now, the government also suggests, as they did in their brief at page 4, that Kuntz is not applicable because Kuntz is, applies only to land use and not to chattel and not to personal property. Again, the opinion plainly eliminates that possible construction, because the court uses as the example of property where there might be a monetary exaction instead of property, uses the example of a bank account and proceeds to discuss three cases, Webb's Fabulous Pharmacies and the two Iolta cases, as being examples of what it's talking about. Kuntz is not limited to land use. It applies to personal property, and it holds that the fact that the taking was imposed as a condition on something else does not mean that it is not per se. The per se question, at its heart, has to do with whether the government has taken ownership of the thing or whether the government is merely restricting the use or diminishing the value of the thing. Here, there is absolutely no question. At the end of the day, the government has the raisins or it has the money. That is a transfer of ownership. It is obviously a per se taking. Now, the government argues that they retain a property interest in it because if they participated in the program, at the end of the day when the surplus is sold, they get a return. Your Honor, in one of these years, the return was zero, and in one of these years, the return was far less than the value of the raisins. So if that's their idea of just compensation, I don't know what the Fifth Amendment means. That's the only relevance of the return, is that that's the compensation that the farmers get for the taking of their property. Well, I think their argument, if I understand it, is that that does not constitute a taking. I know you don't agree with the argument, but they're saying because they retain some property interest in their raisins with the prospect of return, there's not been a taking. And specifically that there's not been a per se taking, Your Honor, there are so many cases that are inconsistent with that. Many, many cases are per se takings, even though the property, much of the property remains with the property owner. One of the early cases, Cosby, the overflight case, was treated as a per se taking, even though the chicken farmer still continued to own his land. Loretto is a per se taking, even though the apartment owner still owns the apartment building. I simply do not know where my friend gets the idea that there can be no per se taking. In fact, the Kuntz opinion explicitly rejects that, where it says that if it's a per se taking, excuse me, it's the Arkansas game and fish decision last term, specifically says that if it's a per se taking, there's a categorical duty to pay whether or not, whether the taking is of a part of the interest or the entire thing is irrelevant. And I also do want to address the other. Counsel, if I could interject a question, please. Is it correct, as the government argues, that your client has abandoned or waived or does not assert any taking theory other than per se taking? Yes, Judge Gould, we have never argued a regulatory taking. That is not in the case. My friend was entirely accurate about that. But he was not accurate when he claimed that we've been shifting theories. The fact is, when you look at this fine, it comes in two different parts. There are two different components to it. There's the monetary compensation part called compensatory, and then there's the punitive part of the fine. Roughly $483,000 is the monetary equivalent of the raisins that the government believes that it should be, should have been given. That is a taking because even though it's money, it is a monetary exaction which is closely identified with a specific piece of property, and thus a taking under Kuntz. I think before Kuntz, that was an open question in the law. The second piece, which is about $200,000, is indeed a fine for not coughing up the raisins in the first place. The reason that is unconstitutional is because the government cannot fine you for not complying with an unconstitutional order. So the first part, it is the taking with respect to the compensatory portion. The taking is the monetary exaction, which is tied to an identifiable piece of property, and the second part of the exaction is unconstitutional under cases like Missouri Pacific versus Nebraska, and a decision by Justice Holmes that holds that the government cannot fine a property owner for refusing to comply with an unconstitutional taking. One last correction. The, my friend relies upon this Court's decision in the Washington Legal Foundation case to claim that the Horns do not have an interest in this matter, but the people who are held not to have standing in that case had no financial interest. They were not going to gain. In this case, the Horns are the only people with a financial interest. If the Court sides with them, they will be almost $700,000 better off. In the Washington case, those plaintiffs were not affected in their pocketbooks by the litigation. So the idea that the government can come in, structure a regulatory program so as to impose the entire cost upon a group of people, in this case, a couple, and then say that they don't have standing to object to the consequences or to the unconstitutionality of that, I think, is completely unprecedented. Since you have a couple of minutes left, I wondered what you thought of Wickard v. Fildren. Is that still good law? I think it is. Good. Which establishes that there's no Commerce Clause objection to this program. Okay. I was just curious. I don't know if I think you've ever argued a Commerce Clause objection to this. We have not. No. This has been, I mean, we did have a few other claims that are beside the road, like our excessive fines claim, and I think a very good statutory argument that we lost the Chevron deference grounds. And we're not raising that. But all that is left is the Takings Clause. And the Commerce, we've never challenged the overall authority of the federal government to regulate raisins in interstate commerce. Thank you. Okay. Judge Gould, thank you. Thanks for having me. You're welcome. Case just argued will be submitted. Thank you both very much for the argument.
judges: Reinhardt, Hawkins, Gould